**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**ADAM SWAIN,**

**Plaintiff,**

**v.** **Civil Action No.**

**EQUIFAX INFORMATION SERVICES, LLC,**
SERVE: Corporation Service Company, Reg. Agent
100 Shockoe Slip
2nd Floor
Richmond, VA 23219

**EXPERIAN INFORMATION SOLUTIONS, INC.,**
SERVE: CT Corporation System, Reg. Agent
4701 Cox Rd,
Ste. 285
Glen Allen, VA 23060

**TRANS UNION, LLC,**
SERVE: Corporation Service Company, Reg. Agent
100 Shockoe Slip
2nd Floor
Richmond, VA 23219

**and**

**PROCOLLECT, INC.,**
SERVE: Registered Agent Solutions, Inc., Reg. Agent
7288 Hanover Green Dr.
Mechanicsville, VA 23111

**Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Adam Swain, by counsel, and for his Complaint against Defendants Equifax Information Services, LLC ("Equifax), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and ProCollect, Inc. ("ProCollect"), he states as follows:

### PRELIMINARY STATEMENT

1. This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA") and the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA").

2. Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

3. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete the information. 15 U.S.C. § 1681i.

4. The FCRA's accuracy provisions demand that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like ProCollect, particularly when a consumer makes a dispute about information reported.

5. Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity is ProCollect (the "Furnisher"). The FCRA demands that each party separately conduct a

reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6. Plaintiff brings claims under Section 1681e(b) against Equifax, Experian, and Trans Union because each reported inaccurate account information about Plaintiff regarding an inaccurate collection account with ProCollect. Equifax, Experian, and Trans Union reported on Plaintiff's credit files that Plaintiff owed a debt to his former landlord, despite Plaintiff having paid that debt in full approximately three months prior. When Plaintiff disputed the accuracy of the account, Equifax, Experian, and Trans Union did not reasonably investigate his disputes, also violating Section 1681i.

7. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax, Experian, and Trans Union have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Experian, and Trans Union have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

8. Likewise, ProCollect violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all ProCollect did was consult its own records about the wrongful account and confirm to the agencies the inaccurate information it was already reporting. ProCollect failed to correct the inaccurate and derogatory reporting on Plaintiff's credit reports in response to the first

*nine* of Plaintiff's disputes. Despite receiving ample notice and proof that the account had been paid off months before ProCollect began reporting, ProCollect did not remove the derogatory information from Plaintiff's credit files until after Plaintiff's tenth or eleventh dispute.

9. Finally, ProCollect violated the FDCPA through its reporting on Plaintiff's credit. The timeline surrounding when Plaintiff first learned that ProCollect was attempting to collect the debt and the time that ProCollect began reporting on Plaintiff's credit is compressed. Plaintiff discovered that ProCollect was attempting to collect a debt from him in late September of 2022. Plaintiff disputed the debt during his first conversation with a ProCollect agent and provided ProCollect with proof that he had paid that debt off several months earlier, in July of 2022. In October of 2022, Plaintiff discovered that ProCollect was reporting on his credit. Because of this compressed timeline, for the FDCPA causes of action against ProCollect, Plaintiff pleads in the alternative. Either ProCollect began reporting on Plaintiff's credit prior to contacting him, in violation of 15 U.S.C. § 1692f & 12 C.F.R. § 1006.30(a), or ProCollect began reporting on Plaintiff's credit after Plaintiff disputed the debt and provided proof that the debt had been paid, in violation of 15 U.S.C. § 1692e. And in either scenario—whether ProCollect violated § 1692f & 12 C.F.R. § 1006.30(a) or § 1692e—ProCollect violated § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

11. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). A substantial portion of the events giving rise to the claim occurred in this District and Division.

**PARTIES**

12. Plaintiff is a natural person, and a "consumer" as defined by 15 U.S.C. § 1681a(c).

13. Equifax is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

14. Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15. Equifax disburses consumer reports to third parties under contract for monetary compensation.

16. Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, VA.

17. Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18. Experian disburses consumer reports to third parties under contract for monetary compensation.

19. Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

20. Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

21. Trans Union disburses consumer reports to third parties under contract for monetary compensation.

22. ProCollect, Inc. is collection agency authorized to do business in the Commonwealth of Virginia through its registered agent in Mechanicsville, VA.

23. ProCollect is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

24. ProCollect is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6). Specifically, ProCollect uses instrumentalities of interstate commerce or the mails in its business, the principal purpose of which is the collection of debts. ProCollect regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. No exception to the term "debt collector" applies to exempt ProCollect from regulation under the FDCPA.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

25. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v.*

*Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

26. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

27. Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

28. Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

29. Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly…of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

30. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

31. It has long been the law that a CRA, such as Equifax, Experian, or Trans Union does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to

contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

32. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

33. As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

34. Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

35. It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

***Section 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as ProCollect to Perform a Detailed and Systematic Investigation of Consumer Disputes***

36. Today, furnishers such as ProCollect have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

37. Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs.

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

38. "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

***Plaintiff's Rental Account is Wrongfully Sent to Collection***

39. From November 1, 2021 through May 31, 2022, Plaintiff was a resident leasing an apartment operated by Lynd Management Group, LLC d/b/a Mayflower Apartments ("Mayflower") located in Virginia Beach, Virginia.

40. Throughout his entire lease with Mayflower, Mayflower notified Plaintiff of outstanding balances through an application on his phone called ActiveBuilding.

41. Plaintiff moved out of the apartment prior to the "move-out" date of June 1, 2022.

42. In early July of 2022, Mayflower alerted Plaintiff that he owed a balance of $264.60.

43. Plaintiff paid off the entire balance owed to Mayflower on July 7, 2022 via certified check.

44. In late September of 2022, ProCollect began calling Plaintiff and attempting to collect the Mayflower debt.

45. At first, Plaintiff assumed that the calls from ProCollect were spam.

46. After ProCollect called Plaintiff for approximately two or three days in a row, Plaintiff noticed that several of his missed calls were from the same number. Plaintiff then listened to a voicemail from ProCollect and realized that ProCollect was attempting to collect the Mayflower debt that Plaintiff had already paid almost four months earlier.

47. Once Plaintiff discovered that ProCollect was attempting to collect the Mayflower debt from him, Plaintiff called ProCollect to dispute the debt. During that phone call, the ProCollect agent told Plaintiff to send proof of payment to collector@procollect.com.

48. On September 27, 2022, Plaintiff obtained a ledger from Mayflower which showed that his account had been paid in full as of July 7, 2022.

49. On September 27, 2022, Plaintiff emailed ProCollect at collector@procollect.com. In his email, Plaintiff attached the ledger and said, "Please see attached ledger that shows a zero balance as of 7 July 2022. I'd like any reflections on my credit report removed immediately."

50. On September 28, 2022, Plaintiff again emailed the ledger to collector@procollect.com. Plaintiff provided two contact numbers and requested that ProCollect remove any references to the account from Plaintiff's credit.

51. ProCollect did not stop attempting to collect from Plaintiff after receiving the September 2022 emails.

***Plaintiff Discovers the CRA Defendants were Reporting the Wrongful Collection Account with ProCollect and Disputes Those Inaccuracies Repeatedly***

52. On or around October 5, 2022, Plaintiff discovered that ProCollect was reporting an inaccurate and derogatory collection account on his credit file with Experian.

53. Specifically, ProCollect was inaccurately reporting that Plaintiff owed money to Mayflower. This reporting was inaccurate. Plaintiff had paid the entire amount owed to Mayflower several months prior, on July 7, 2022.

54. ProCollect's inaccurate and derogatory reporting harmed Plaintiff and threatened Plaintiff's livelihood. Plaintiff maintains a security clearance as a requisite for his continued employment, and negative credit reports place that security clearance at risk.

55. Under 12 C.F.R. § 1006.30(a) of Regulation F, implementing 15 U.S.C. § 1692, ProCollect was prohibited from reporting on Plaintiff's credit report without first (1) speaking with Plaintiff about the debt in person or over the telephone, or (2) placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

56. ProCollect never contacted Plaintiff in writing. ProCollect only communicated with Plaintiff regarding the Mayflower debt via telephone.

57. Additionally, under 15 U.S.C. § 1692e(8), a debt collector is prohibited from reporting information which the debt collector knows or should know is false.

58. ProCollect began reporting on Plaintiff's credit in violation of 12 C.F.R. § 1006.30(a) because it did so prior to (1) speaking with Plaintiff about the debt or (2) placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

59. In the alternative, ProCollect began reporting on Plaintiff's credit after speaking with Plaintiff, and in violation of 15 U.S.C. § 1692e(8), because Plaintiff disputed the debt during his conversation with the ProCollect agent, Plaintiff provided proof that the debt had been paid, and ProCollect knew that the information it reported was false.

60. On or around October 5, 2022, shortly after Plaintiff discovered that ProCollect was reporting on his credit file with Experian, Plaintiff disputed the ProCollect account with Experian.

61. Neither Experian nor ProCollect corrected the reporting in response to Plaintiff's October 2022 dispute.

62. On or around February 24, 2023, Plaintiff again disputed the ProCollect account with Experian.

63. Neither Experian nor ProCollect corrected the reporting in response to Plaintiff's February 2023 dispute.

64. On or around May 4, 3023, Plaintiff obtained copies of his credit files with Equifax, Experian, and Trans Union.

65. On Plaintiff's Equifax report dated May 4, 2023, ProCollect was reporting a paid collection for $255 with "MAYFLOWER APARMENTS LYND" as the original creditor. The collection showed a "Date Reported", "Status Date", and "Balance Date" of "Apr 01, 2023".

66. Equifax's reporting was inaccurate. Plaintiff had paid off any amount that he owed to Mayflower almost nine months previously, on July 7, 2022. Plaintiff paid off the entire amount owed to Mayflower *before ProCollect ever contacted him*. It was inaccurate for Equifax to report a status date and balance date of April 1st, 2023 when Plaintiff had paid the balance on the account to the original creditor almost nine months earlier. It was inaccurate and unlawful for ProCollect to start reporting on Plaintiff's credit *at all* when ProCollect had actual knowledge in September of 2022 that Plaintiff had paid off the entire balance.

67. On Plaintiff's Experian report dated May 4, 2023, ProCollect was reporting a paid collection of $255 with a "term" of one month showing a "Status Updated" in "Oct 2022". The payment history and balance history showed a status of "C" (for "Collection") in October of 2022 and a balance of $255 with $0 paid in September of 2022.

68. Experian's reporting was inaccurate. Again, Plaintiff had paid off the entire amount owed to Mayflower before ProCollect ever contacted him. It was unlawful for ProCollect to have *ever* reported this collection account on Plaintiff's credit. In addition, it was clearly inaccurate for ProCollect to report that Plaintiff owed $255 in September of 2022 when Plaintiff had paid the entire amount due in July of 2022 (before ProCollect contacted him or started reporting on his credit).

69. On Plaintiff's Trans Union report dated May 4, 2023, Trans Union showed the ProCollect account with "MAYFLOWER APARTMENTS LYND" as the Original Creditor, an"Account Type" of "Open Account", a "Pay Status" of "Account Paid in Full was a Collection", a "Last Payment Made" date of "09/29/2022" and a "Date Closed" of "09/29/2022". Trans Union's reporting of the ProCollect account was inaccurate. Plaintiff made the payment to Mayflower on July 7, 2022. It was inaccurate for ProCollect to report a "Last Payment Made" date of 09/29/2022. In fact, Trans Union should not have been reporting an account with ProCollect *at all*, because Plaintiff paid off the entire balance owed before ProCollect ever contacted Plaintiff.

70. On or around May 25, 2023, Plaintiff disputed the inaccurate and derogatory ProCollect account with each of the CRA Defendants. In the dispute letters, Plaintiff explained that he paid off the debt with the original creditor (Mayflower Apartments/Lynd Management Group, LLC) before ProCollect ever contacted him or began reporting on his credit. Plaintiff included a copy of the account ledger from Mayflower as proof. To prove his identity, with each letter he included copies of his driver's license, his certificate of honorable discharge from active duty, and a civilian leave and earnings statement from May of 2023. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested.

71. Sometime in June of 2023, Equifax notified Plaintiff of its results following Plaintiff's May 2023 dispute. The results revealed that Equifax had "verified" and "updated" the inaccurate and derogatory information reporting on Plaintiff's credit. Equifax failed to correct the inaccurate information on Plaintiff's credit in response to his dispute.

72. On or around June 21, 2023, Experian notified Plaintiff of its results following Plaintiff's May 2023 dispute. Experian failed to correct the inaccurate information on Plaintiff's credit in response to his dispute.

73. On or around June 22, 2023, Trans Union notified Plaintiff of its results following Plaintiff's May 2023 dispute. Trans Union failed to correct the inaccurate information on Plaintiff's credit in response to his dispute.

74. On or around July 13, 2023, Plaintiff again disputed the inaccurate and derogatory ProCollect account with each of the CRA Defendants. In the dispute letters, Plaintiff explained that he paid off the debt with the original creditor (Mayflower Apartments/Lynd Management Group, LLC) before ProCollect ever contacted him or began reporting on his credit. Plaintiff included a copy of the account ledger from Mayflower as proof. To prove his identity, with each letter he included copies of his driver's license, his certificate of honorable discharge from active duty, and a civilian leave and earnings statement from May of 2023. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested.

75. On or around July 22, 2023, Trans Union mailed a letter to Plaintiff in which it said that it received Plaintiff's letter—which included copies of his driver's license, his certificate of honorable discharge from active duty, and a civilian leave and earnings statement—"but it didn't appear that you or a properly authorized third party sent it to us." Trans Union refused to do any reinvestigation at all in response to Plaintiff's July 2023 dispute.

76. On or around July 23, 2023, Equifax responded to Plaintiff's July 2023 dispute. In its response, Equifax told Plaintiff that "THE DISPUTED ITEM IS NOT CURRENTLY REPORTING ON THE EQUIFAX CREDIT FILE." With its response, Equifax included a copy of Plaintiff's Equifax credit file, dated July 23, 2023, which showed that the inaccurate and derogatory ProCollect account was still reporting on Plaintiff's credit.

77. Upon information and belief, Experian did not send Plaintiff any response to his July 2023 dispute.

78. On August 21, 2023, Plaintiff obtained updated copies of his credit files with Equifax, Experian, and Trans Union. All three CRAs were still reporting the inaccurate and derogatory ProCollect account on Plaintiff's credit.

79. On or around September 8, 2023, Plaintiff again disputed the inaccurate and derogatory ProCollect account with each of the CRA Defendants. In the dispute letters, Plaintiff explained that he paid off the debt with the original creditor (Mayflower Apartments/Lynd Management Group, LLC) before ProCollect ever contacted him or began reporting on his credit. Plaintiff included a copy of the account ledger from Mayflower as proof. To prove his identity, with each letter he included copies of his driver's license, his certificate of honorable discharge from active duty, and a civilian leave and earnings statement from May of 2023. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested.

80. On or around September 22, 2023, Equifax responded to Plaintiff's September 2023 dispute. Equifax "verified" the inaccurate and derogatory reporting on Plaintiff's credit.

81. On or around October 3, 2023, Experian responded to Plaintiff's September 2023 dispute. Experian's results show that the ProCollect account was no longer reporting on Plaintiff's Experian credit file.

82. On or around October 3, 2023, Trans Union responded to Plaintiff's September 2023 dispute. Trans Union's results show that the ProCollect account was deleted in response to Plaintiff's September 2023 dispute.

83. On or around October 11, 2023, Plaintiff obtained a copy of his credit file from Equifax and discovered that the ProCollect account was no longer reporting.

***The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes***

84. Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Experian, and Trans Union to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

85. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

86. Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

87. Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

88. Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

89. Teleperformance agents and Experian Chile agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

90. The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

91. In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer must click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian. It gets sent to the Defendant CRAs' creditor customers (such as ProCollect) for their sole review and consideration.

92. Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax

and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

93. Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

94. Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage, or reliably influence the employees of their respective third-party outsource vendors.

95. Equifax, Experian, and Trans Union themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

***The CRA Defendants Forwarded Plaintiff's Disputes to ProCollect, Who Repeatedly Did Nothing***

96. In each instance in which Plaintiff disputed the ProCollect account with the CRAs, the CRAs forwarded Plaintiff's disputes to ProCollect using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results back to CRAs.

97. On information and belief, e-Oscar is also the system by which ProCollect has agreed it will accept consumer disputes from the CRAs.

98. Each instance in which ProCollect received one of Plaintiff's disputes from a CRA, ProCollect became obligated under the FCRA to investigate that dispute.

99. The first nine of Plaintiff's disputes to ProCollect to attempt to have it reinvestigate Plaintiff's complaints went unanswered, as ProCollect didn't stop reporting on Plaintiff's credit until after Plaintiff's fifth dispute with Experian, third dispute with Trans Union, and third dispute with Equifax[3].

100. ProCollect repeatedly failed to reinvestigate Plaintiff's complaints.

101. Despite Plaintiff's diligent efforts to use the legal means that are available to him to dispute the erroneous information, ProCollect continued to report the account as accurate to the CRAs. Discovery will show that all ProCollect did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal reporting records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

102. On dates better known to Equifax and ProCollect, Equifax furnished Plaintiff's disputes to ProCollect.

103. On dates better known to Experian and ProCollect, Experian furnished Plaintiff's disputes to ProCollect.

104. On dates better known to Trans Union and ProCollect, Trans Union furnished Plaintiff's disputes to ProCollect.

105. In violation of § 1681s-2(b)(1)(A) of the FCRA, ProCollect failed to reasonably reinvestigate Plaintiff's disputes that ProCollect received from Equifax, Experian, and Trans Union.

106. ProCollect further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to correct, delete, or permanently block the account after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union.

[3] ProCollect verified the inaccurate information to Equifax following Plaintiff's third dispute to Equifax. The inaccurate information was removed from Plaintiff's report sometime after this verification.

107. The Defendant CRAs responded to Plaintiff's disputes, claiming the reported information was verified as accurate and the information was updated. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to ProCollect.

108. Upon information and belief, CRA Defendants timely notified ProCollect of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

109. Upon information and belief, ProCollect received timely notice of Plaintiff's disputes from Equifax, Experian, and Trans Union, and the supporting documents submitted with Plaintiff's disputes.

110. By its actions as described herein, ProCollect furnished and communicated false credit information regarding Plaintiff.

***Plaintiff Suffered Actual Harm***

111. Equifax, Experian, and Trans Union continued to report the derogatory ProCollect account on Plaintiff's credit reports even after being notified that this information is false.

112. Plaintiff attempted to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

113. As a result of the inaccurate reporting and failures to properly respond to Plaintiff's disputes, Plaintiff has suffered damages, including, but not limited to:

a. Potential harm to Plaintiff's security clearance and livelihood;

b. Harm to credit opportunities;

c. Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

d. Loss of time attempting to correct the inaccuracies;

e. Stress associated with attempting to resolve this matter; and

f. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: Extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance.

***Defendants' Conduct was Willful***

114. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

115. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

116. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

117. The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

118. Just in federal court alone, during the past decade, ProCollect has had to defend approximately 189 consumer credit lawsuits.

119. In many of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

120. CRA Defendants knew or should have known of this litigation history.

121. CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

122. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

123. Each Defendant regularly receives unredacted consumer dispute details from this database.

124. Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

125. Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

126. Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Tran Union.

127. Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union, and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

128. Just in the last 12 months alone, Equifax, Experian, and Trans Union have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

129. While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

130. Equifax, Experian, and Trans Union have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is

affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

131. Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

132. Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other

> sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

133. Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

134. In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[4] The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

135. The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

136. Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[5]

137. The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix

---

[4] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Release/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.
[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

138. Among many of Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

139. Proportionately similar, ProCollect is well-informed of its duties because it has also been sued in federal court repeatedly for consumer credit claims by consumers – many involving alleged violations of the FCRA.

140. ProCollect was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

141. ProCollect was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

142. ProCollect was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

143. ProCollect was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

144. ProCollect was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

145. Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

146. Defendants' procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FAIR CREDIT REPORTING ACT

**15 U.S.C. § 1681e(b) - *against Equifax, Experian, and Trans Union***

147. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

148. Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from ProCollect.

149. As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

150. Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of ProCollect's reporting, Equifax, Experian, and Trans Union each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

151. Equifax, Experian, and Trans Union each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

152. The violations by Equifax, Experian, and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

153. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681i(a) - *against Equifax, Experian, and Trans Union***

154. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

155. Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff's credit files.

156. Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(2) by conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they each received with Plaintiff's disputes.

157. Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff regarding the ProCollect account.

158. Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

159. After Experian received Plaintiff's July 2023 Dispute Letter, it violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

160. As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

161. The violations by Equifax, Experian, and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

162. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III:**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)(A) & (B) - *against ProCollect***

163. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

164. ProCollect violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after her disputes were furnished to it by Equifax, Experian, and Trans Union.

165. ProCollect violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes to ProCollect.

166. As a result of ProCollect's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

167. The violations by ProCollect were willful, rendering ProCollect liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, ProCollect was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

168. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from ProCollect in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV:**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)(E) - *against ProCollect***

169. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

170. Defendant ProCollect violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union. This failure to correct Plaintiff's information resulted from ProCollect's failure to investigate as articulated in this Complaint, after ProCollect received notice of Plaintiff's disputes from Equifax, Experian, and Trans Union.

171. As a result of this conduct (the action and inaction of ProCollect), Plaintiff suffered actual damages, including but not limited to: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

172. The violations by ProCollect were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, ProCollect was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

173. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from ProCollect in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

**COUNT V:**
**VIOLATION OF FAIR DEBT COLLECTION PRACTIVES ACT**
**15 U.S.C. § 1692e - *against ProCollect***

174. Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

175. For each month in which ProCollect reported on Plaintiff's credit, ProCollect, violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(8), and (10) by using false representations or deceptive means to collect or attempt to collect a debt, and by "[communicating] to any person credit information which is known or which should be known to be false . . ."

176. ProCollect used false representations and deceptive means to attempt to collect a debt each time that it reported on Plaintiff's credit, because Plaintiff did not owe any debt to ProCollect (or Mayflower) when ProCollect began reporting on Plaintiff's credit.

177. In addition, ProCollect communicated information to Equifax, Trans Union, and Experian, which was known or which should have been known to be false, each time that it reported the account with ProCollect despite knowing that Plaintiff had paid the account off *prior* to when ProCollect began reporting.

178. Further, ProCollect communicated information to Equifax, Trans Union, and Experian, which was known or which should have been known to be false, each time it falsely reported that Plaintiff owed a balance of $255 in September of 2022 and that Plaintiff made a payment on the account in September of 2022.

179. ProCollect was aware prior to reporting on Plaintiff's credit that Plaintiff's debt with Mayflower had been paid in full.

180. Plaintiff disputed the debt during his conversation with the ProCollect agent and provided proof that the debt had been paid. ProCollect subsequently began reporting on Plaintiff's credit after speaking with Plaintiff, despite knowing that the debt had been paid on July 7, 2022—before ProCollect ever started reporting on Plaintiff's credit.

181. ProCollect has repeatedly violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(8) & (10).

182. As a result of this conduct (the action and inaction of ProCollect), Plaintiff suffered actual damages, including but not limited to: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

183. Plaintiff is entitled to actual and statutory damages against ProCollect, as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. §1692k.

**COUNT VI:**
**VIOLATION OF FAIR DEBT COLLECTION PRACTIVES ACT**
**15 U.S.C. § 1692f & 12 C.F.R. § 1006.30(a) of Regulation F - *against ProCollect***

184. Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

185. ProCollect violated the Fair Debt Collection Practices Act, 15 U.S.C. 1692f, by using unfair and unconscionable means to collect or attempt to collect a debt in violation of 12 C.F.R. § 1006.30(a).

186. More specifically, under 12 C.F.R. § 1006.30(a), "[A] debt collector must not furnish to a consumer reporting agency, as defined in section 603(f) of the Fair Credit Reporting Act (15 U.S.C. 1681a(f)), information about a debt before the debt collector: (i) Speaks to the consumer about the debt in person or by telephone; or (ii) Places a letter in the mail or sends an electronic message to the consumer about the debt and waits a reasonable period of time to receive a notice of undeliverability."

187. ProCollect began reporting on Plaintiff's credit before (i) Speaking to Plaintiff about the debt in person or by telephone, or (ii) Placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

188. As a result of this conduct (the action and inaction of ProCollect), Plaintiff suffered actual damages, including but not limited to: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

189. Plaintiff is entitled to actual and statutory damages against ProCollect, as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. 1692k.

**COUNT VII:**
**VIOLATION OF FAIR DEBT COLLECTION PRACTIVES ACT**
**15 U.S.C. § 1692d - *against ProCollect***

190. Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

191. ProCollect violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692d, by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

192. ProCollect began reporting on Plaintiff's credit before (i) Speaking to Plaintiff about the debt in person or by telephone, or (ii) Placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

193. In the alternative, ProCollect began reporting on Plaintiff's credit—and continued reporting on Plaintiff's credit—after having actual knowledge that Plaintiff had paid the underlying debt almost three months prior.

194. In both scenarios, the natural consequence of ProCollect's actions are to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

195. As a result of this conduct (the action and inaction of ProCollect), Plaintiff suffered actual damages, including but not limited to: Potential harm to Plaintiff's security clearance and livelihood, extensive and pervasive anxiety, depression, irritability, insomnia, crying spells, nausea, weight changes, muscle aches, worsened high blood pressure, a need for increased medication, feelings of fear, feelings of embarrassment, loss of concentration, loss of privacy, harm to his relationships, harm to his reputation, harm to his job performance, lost credit

opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute Plaintiff letters.

196. Plaintiff is entitled to actual and statutory damages against ProCollect, as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. 1692k.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1) Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax, Experian, Trans Union and ProCollect;

(2) Award Plaintiff attorney's fees and costs against Equifax, Experian, Trans Union and ProCollect under the FCRA;

(3) Award Plaintiff actual and statutory damages against ProCollect due to its violations of the Fair Debt Collection Practices Act;

(4) Award Plaintiff reasonable attorney's fees and costs against ProCollect under the Fair Debt Collection Practices Act;

(5) Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(6) Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

**RESPECTFULLY,**

**ADAM SWAIN**

By: /s/ Mark C. Leffler
Mark C. Leffler, VSB #40712
Leonard A. Bennett, VSB #37523
Adam W. Short, VSB #98844
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com

Emily Connor Kennedy, VSB #83889
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad St., Suite 300
Richmond, VA 23219
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: emily@clalegal.com